AUTO-OWNERS INSURANCE COMPANY, Plaintiff-Appellant and Counterdefendant-Appellee, v. SOUTH SIDE TRUST AND SAVINGS BANK, Defendant-Appellee and Counterplaintiff-Appellant.

Third District   Nos. 3—88—0117, 3—88—0133 cons.

Opinion filed November 22, 1988.

Timothy L. Bertschy and Bradford B. Ingram, both of Heyl, Royster, Voelker & Allen, of Peoria, for Auto-Owners Insurance Company.

Franklin L. Renner, of Littler, Renner, Howard & Wombacher, of Peoria, for South Side Trust & Savings Bank.

JUSTICE SPITZ delivered the opinion of the court:

This appeal and cross-appeal arise from an action initiated by plaintiff Auto-Owners Insurance Company against defendant South Side Trust and Savings Bank in the circuit court of Peoria County. Plaintiff sought to have the trial court reform a letter of credit issued by defendant to secure a performance bond issued by plaintiff on behalf of Grawey Electric, Inc. Defendant counterclaimed to recover $5,620.08 which the bank had mistakenly paid in reliance on the letter of credit.

During a bench trial, the trial court entered judgment in favor of defendant at the close of plaintiff's case, ruling that plaintiff failed to meet the burden of proof. At the close of all the evidence, the trial court granted judgment in favor of plaintiff and against defendant on the counterclaim.

In this appeal, there are three issues. The first issue is whether the documents submitted by plaintiff comply with the letter of credit, thereby requiring payment from defendant. In the event the first issue is answered in the negative, this court must then decide whether there was proved such mutual mistake as would require reformation of the letter of credit. Lastly, if defendant is not obligated to pay on the letter of credit, is defendant entitled to be reimbursed for payments already made? The facts relevant to a determination of these issues follow.

Grawey Electric, Inc. (Grawey), is an Illinois corporation, operated by George Collins and his son Don. Don Collins is president of Grawey.

In 1980 a business opportunity developed for Grawey to perform electrical subcontracting work on the construction of a K mart store at the Cherry Tree Shopping Center (Cherry Tree) in Washington, Illinois. To obtain this work, Grawey needed to secure a performance bond in excess of $200,000.

To obtain that bond, Don Collins went to his insurance agent, Nick Yates, in May 1980. Yates is an independent agent and does per-

formance bond business through plaintiff as well as other companies.

Yates contacted plaintiff on May 15, 1980, and spoke with Donna Hansen, an employee in the bond department. Hansen told Yates that plaintiff would issue a performance bond for Grawey, but only on several conditions, one of which was the obtaining of an irrevocable letter of credit as security for the bond.

On the following day, Yates called Charles Dan Karpowicz, vice-president and cashier of defendant. Yates specifically told Karpowicz he needed to obtain a performance bond for Grawey and plaintiff was willing to issue the performance bond, but plaintiff insisted upon first obtaining an irrevocable letter of credit from defendant.

Karpowicz stated that Grawey had an established line of credit with the defendant but that the line of credit had already been extended. Karpowicz stated that he did not feel the defendant at that time would issue an irrevocable letter of credit. However, he did not absolutely foreclose the possibility of the defendant issuing a letter of credit for Grawey.

On May 20, 1980, Yates had a conversation with another bonding company, Western Insurance Company. Yates had provided Western Insurance Company with financial information concerning Grawey. On May 20, Western Insurance Company's agent said that he could not issue a performance bond based upon the financial information the company had been given.

On the same date, Yates spoke again to Don Collins. He told Collins that Western Insurance Company had declined to issue the performance bond.

Hansen called Yates on May 21. She stated that she had been given permission to issue the performance bond if a $75,000 irrevocable letter of credit was obtained. Yates did not tell Hansen during that conversation or at any time that a letter of credit was not obtainable from defendant for Grawey.

Immediately after Hansen's call, Yates called Don Collins and told him that plaintiff would issue the performance bond if a $75,000 irrevocable letter of credit could be obtained from the defendant. He further advised Collins that he had a blank form for the letter of credit that should be retyped on defendant's stationery when the defendant issued the letter.

Collins subsequently picked up the letter of credit form and Yates instructed him again to make sure that it was typed on defendant's letterhead. Collins sent the form letter of credit to defendant on May 21, 1980, with a letter of transmittal. This letter specified the principal on the performance bond would be Grawey and that Grawey

would be doing the work.

On May 27, Yates called Collins to see what had transpired. Based upon what Collins told him, Yates felt that the transaction could not be accomplished and he called Hansen to thank her for her help.

Although the initial application for Grawey alone had been turned down, negotiations continued with defendant regarding placing George Collins on the bond as principal. Karpowicz testified the defendant required as a condition of issuing the letter of credit that George Collins be designated as principal on the bond, and he so informed Don Collins. Sometime between May 27 and June 12, Don Collins presented Karpowicz a form letter of credit with the name of George Collins as principal pursuant to their discussions. A letter of credit was issued by defendant on June 12, 1980. In connection therewith, Don Collins and George Collins signed an agreement whereby they pledged their personal assets to be collateral for the contingent liability on the letter of credit.

By requiring George Collins to be a principal on the bond, Karpowicz knew that George Collins would carry through everything that Grawey Electric was to do. Karpowicz knew that George Collins had the expertise to do the job. Without George Collins' involvement in the entire project, bond, and letter of credit, along with his expertise as an electrician, the defendant would not have issued the letter of credit. By requiring plaintiff to have George Collins as a principal on the bond, George Collins would have a duty to perform on the project.

Defendant issued an invoice as of that date charging a fee of $3,750 to Grawey Electric for the transaction. Don Collins delivered the executed letter of credit to Yates. Except for the blanks being filled in, it read the same as the form which was originally provided by Yates.

Karpowicz testified that when he signed the letter of credit he understood that if Grawey defaulted on its job at the Cherry Tree such that plaintiff had to pay on the performance bond, plaintiff could look to the defendant for recovery under the letter of credit through George Collins. This same intent and understanding was not shared at that time by Yates and Hansen, who understood Grawey was the principal, and the bond, as drafted and signed, expressed this understanding of Hansen and Yates.

The second paragraph of the letter of credit identifies the principal on the bond. In the case of a performance bond, the principal is the party performing the contract. Although Grawey Electric was the party performing the work on the Cherry Tree job, the letter of credit identified "George Collins of Grawey Electric, Inc." as principal in-

stead of identifying "Grawey Electric of Peoria, Illinois" as principal.

Yates knew that neither plaintiff nor defendant wanted the final risk of Grawey because of the financial condition of the company. During any previous discussion with Don Collins, Yates did not instruct him, in any fashion, on how the blanks were to be filled in and Yates did not know who filled in the blanks in the letter of credit.

After the letter of credit was signed, Don Collins returned it to Yates. Yates in turn, without carefully reading it, took it to plaintiff for the issuance of the performance bond. Yates delivered it to Hansen, who briefly reviewed it, and then showed it to her boss, who glanced at it. Hansen did not notice the discrepancy in the listing of the principal on the letter of credit. Auto-Owners issued the performance bond to Grawey with Grawey Electric, Inc., as principal, not George Collins as required by the letter of credit.

Yates did not send a copy of the bond to defendant, and Karpowicz had not seen it prior to trial. Karpowicz testified that during the negotiations with Don Collins, he intended that the letter of credit require that George Collins be the principal on the performance bond issued by plaintiff. Karpowicz further testified that plaintiff could collect if the terms of the letter of credit were complied with and one of those conditions was that George Collins was named as principal. The defendant would pay if plaintiff complied with the terms of the letter of credit.

In 1981 Grawey defaulted on the Cherry Tree job. Claims were filed against plaintiff on the performance bond and plaintiff in turn advised defendant on November 19, 1981, that it intended to draw upon the irrevocable letter of credit once the monetary amounts of the claims were determined.

Negotiations proceeded into 1982 with the various bond claimants. In the spring of 1982, attempts were made to narrow the issues and get down to the amounts due and owing to the various claimants. A series of meetings were held, particularly in relation to the Graybar Electric and Joseph Company claims. At these meetings, the claimants' attorneys, the attorney for plaintiff, one of the defendant's officers, and one of the defendant's attorneys were present.

At the first such meeting, the parties present for defendant were attorney Ray Fraser and Allen Covington, vice-president of Commercial Lending. During the meeting, copies of all of the relevant documents, including the personal performance bond, were placed on the table. There was discussion between the parties as to the documents, including the fact that plaintiff had issued the performance bond which had been backed up by the letter of credit from defendant. At

this meeting, which occurred in the spring or early summer of 1982, Covington authorized Brent Gwillim, attorney for plaintiff, to negotiate with the claimants to "put things in a chronological order out of the various issues." Covington had talked to Gwillim about offering money to settle the Grawey responsibility, but thought there was enough money in escrow to offset the amount offered.

No contention was made by the defendant at any time in these meetings that the principals listed on the bond and letter of credit were inconsistent. In the course of these meetings, Covington made a direct offer to Graybar Electric's representatives to settle the case and subsequently gave plaintiff's attorney authority to offer specific sums in settlement to the other claimants.

While admitting that he thought at all times the defendant was liable, Covington denies that he ever saw the performance bond. He had no prior knowledge of the project or the letter of credit or of prior negotiations with Collins.

Covington testified that he had never seen the bond until the week before the trial. There was no copy of the bond in the defendant's file when he was involved in the negotiations, and he had never seen a copy of the bond at the defendant bank. He had conversations about the liability of the defendant simply "because Mr. Gwillim told [him] that the [defendant] was liable." He reported that back to Karpowicz.

While Gwillim testified that Covington had made an offer to settle, Covington testified no such offer was made. Covington had no knowledge of the issues involved because he had no prior knowledge of the facts. He assumed the bank might be liable from the request that he go to a meeting and by statements made by Gwillim. According to Covington, the matter was sent to the defendant's attorney because Covington did not know what the defendant's legal responsibility was. He stated he made no independent decision whether the bank was liable. Although he admits he gave Gwillim authority to "negotiate," Covington denies that he ever provided any settlement authority to Gwillim. However, the evidence contains a letter to Covington from Gwillim in which the specific settlement authority given by the defendant to Gwillim is discussed. Covington never responded to Gwillim that he was not so authorized with regard to settlement.

Karpowicz did not have a copy of the bond when he paid out $5,620.08, and he assumed that the "wording of the bond and the letter of credit" were in "compliance." Although he had not seen a copy of the bond throughout the dealings, an interoffice memo from Karpowicz stated that the defendant "may" have exposure on the letter of

credit. The internal bank memo circulated by Karpowicz dated December 14, 1980, discussed possible liability:

> "[W]e may have an additional exposure on Grawey Electric, Inc. This exposure results from a letter of credit that was issued on 06/12/80, to Auto-Owners Insurance Company in conjunction with the K-Mart development in Sunnyland.
>
> Our collateral for this letter of credit is a mortgage on the residence of George and Ruby Collins valued at $75,000.00, and a second mortgage on Donald and Patricia Collins property valued at $100,000.00 in which Security Savings holds the first mortgage of approximately $50,000.00."

The memo goes on to state that Karpowicz has an appointment to discuss the matter with the defendant's attorney. A subsequent note on the same memorandum indicates that the attorney is to write letters to the Collinses notifying them of the possible claims on the letter of credit and that, in turn, the claims would be pursued against their real estate.

On April 26, 1982, defendant wrote to Auto-Owners to state that the defendant would not extend or renew the letter of credit past its maturity date. Nevertheless, the defendant did, on June 11, 1982, agree to extend the termination date of the letter of credit "for a reasonable time pending the outcome of your negotiations with Graybar Electric."

On May 14, 1982, the defendant reimbursed $5,620.08 to plaintiff for amounts paid out by plaintiff under its performance bond. The defendant's letter of transmittal acknowledges that the payment is made pursuant to the letter of credit. The check clearly states it is for the "Grawey Electric letter of credit."

When defendant's attorney passed away, several claims were still outstanding. Defendant turned its file over to attorney John Parkhurst. Parkhurst had not taken part in any of the negotiations establishing the letter of credit or in the negotiations with claimants. Furthermore, Karpowicz did not talk to Parkhurst about any defenses to the letter of credit.

Nevertheless, on May 3, 1984, Parkhurst, on behalf of the defendant and without previously contacting the defendant, took the position for the first time that the defendant had a defense on the letter of credit, namely that the performance bond of plaintiff had not been issued in the name of "George Collins of Grawey Electric" as was stated in the letter of credit. Neither Karpowicz nor defendant's first attorney had raised this issue. This was the first time Gwillim was advised the defendant was claiming the letter of credit meant that even

if Grawey went into default and plaintiff had to pay, plaintiff could not turn to defendant for recovery under the letter of credit. When the defendant refused to further honor its letter of credit, this suit commenced.

The first contention is whether the documents submitted by plaintiff comply with the letter of credit and therefore require payment from defendant, for if the documents presented by plaintiff conform to the requirements of the "stand-by" letter of credit, defendant is not permitted to go beyond the documents and payment is required without reference to the respective rights and obligations of the parties to the underlying contract. *Pastor v. National Republic Bank* (1979), 76 Ill. 2d 139, 390 N.E.2d 894; *Stringer Construction Co. v. American Insurance Co.* (1981), 102 Ill. App. 3d 919, 430 N.E.2d 1.

■■ In the case at bar, the defendant contends plaintiff failed to present documents which complied with the letter of credit. Plaintiff answers by arguing substantial compliance and citing *Hanson v. Duffy* (1982), 106 Ill. App. 3d 727, 435 N.E.2d 1373. However, *Hanson* does not involve a letter of credit and *Mount Prospect State Bank v. Marine Midland Bank* (1983), 121 Ill. App. 3d 295, 459 N.E.2d 979, decided that "strict compliance" is necessary in order to hold an issuer of a letter of credit accountable for failure to honor a draft.

■■ Here, the letter of credit requires the principal on the performance bond to be "George Collins of Grawey Electric, Inc." However, the bond on which plaintiff is liable as surety names "Grawey Electric, Inc.—Peoria, IL." as principal. Therefore, plaintiff has not strictly complied with the conditions of the letter of credit, a standard form supplied by plaintiff and accepted by plaintiff's bond department, as a condition to issuing the bonds.

■■ The next concern to be addressed is whether plaintiff proved such mutual mistake as would require the reformation of the letter of credit. In the absence of fraud, accident, or mutual mistake clearly proved, a court of equity will not reform a contract. (*Darst v. Lang* (1937), 367 Ill. 119, 10 N.E.2d 659.) In order for a document to be reformed, the evidence must be clear and convincing that a mistake of fact was made which was mutual and common to both parties to the contract. A mistake of law will not justify a reformation. (*Harley v. Magnolia Petroleum Co.* (1941), 378 Ill. 19, 37 N.E.2d 760; *All Brake & Drive Unit Service, Inc. v. Peterson* (1979), 69 Ill. App. 3d 594, 388 N.E.2d 93.) There must have been an agreement between the parties which was incorrectly expressed in the written document. *Beynon Building Corp. v. National Guardian Life Insurance Co.* (1983), 118

Ill. App. 3d 754, 455 N.E.2d 246; *Harden v. Desideri* (1974), 20 Ill. App. 3d 590, 315 N.E.2d 235.

■ Plaintiff argues there was a mistake. Defendant contends there was no mutual mistake because the letter of credit stated exactly what defendant wanted it to state, to wit, the principal was to be *George Collins of Grawey Electric, Inc.*, not Grawey Electric, Inc. The evidence as presented does not establish plaintiff's alleged mutual mistake clearly and convincingly as is required for reformation. As a result, the trial court correctly determined that reformation of the letter of credit is not justified in this case.

Since defendant was not obligated to pay on the letter of credit, is defendant entitled to be reimbursed for payment already made? On the assumption defendant was obligated to pay the money under the terms of the letter of credit, defendant paid $5,620.08. Defendant now asks that, "in equity," the monies be returned.

A number of cases have determined that if the mistaken payment resulted from a mistake of fact, then the payor should recover. If, however, the mistaken payment resulted from a mistake of law, then recovery cannot be had. *Kerr Steamship Co. v. Chicago Title & Trust Co.* (1983), 120 Ill. App. 3d 998, 458 N.E.2d 1009; *Hartford v. Doubler* (1982), 105 Ill. App. 3d 999, 434 N.E.2d 1189; *Board of Education v. Holt* (1976), 41 Ill. App. 3d 625, 354 N.E.2d 534; *Salvati v. Streator Township High School District No. 40* (1964), 51 Ill. App. 2d 1, 200 N.E.2d 122; *Willens v. City of Northlake* (1958), 19 Ill. App. 2d 316, 152 N.E.2d 486.

The evidence is that defendant paid out the money because defendant's employees thought defendant was liable under the letter of credit. Defendant now says that had defendant known the bond did not conform to the letter of credit, defendant would not have paid the money. Defendant also suggests that the reason it was not aware of the noncompliance was due to the failure of plaintiff to supply defendant with a copy of the bond.

Defendant contends the mistake is therefore a mistake of fact because, had their employees known of the noncompliance, the money would not have been paid. Plaintiff argues, however, that defendant thought it was liable and therefore the mistake is a mistake of law, a misinterpreting of the legal effect of the letter of credit.

■ Keeping in mind that the trial court sat as chancellor in this matter, the trial court might well have reflected on the language in *Mount Prospect Bank* case regarding letters of credit, "[b]anks must examine all documents with reasonable care to ascertain that they appear on their face to be in accordance with the terms and conditions

of the credit." (*Mount Prospect Bank*, 121 Ill. App. 3d at 301, 459 N.E.2d at 983-84.) Since the defendant paid the money without demanding to see the bond, the trial court could properly decide defendant was not entitled to be reimbursed under the equitable principle of waiver. See *Northern Trust Co. v. Oxford Speaker Co.* (1982), 109 Ill. App. 3d 433, 440 N.E.2d 968, which held waiver and estoppel may be applied to letter of credit transactions.

Accordingly, the judgment of the circuit court of Peoria County is affirmed.

Affirmed.

LUND and KNECHT, JJ., concur.