**INTEGRATED MEASUREMENT SYSTEMS, INC., an Oregon Corporation, Plaintiff,**

**v.**

**INTERNATIONAL COMMERCIAL BANK OF CHINA, a Taiwan, Republic of China corporation, and Overseas Chinese Commercial Banking Corporation, a Taiwan, Republic of China corporation, Defendants.**

**No. 89 C 9019.**

United States District Court, N.D. Illinois, E.D.

Feb. 5, 1991.

---

Stanley J. Adelman, Howard C. Emmerman, Myrna Baskin Goldberg, Rudnick & Wolfe, Chicago, Ill., for plaintiff.

Michael J. Koenigsknecht, Andrew C. Spiropoulos, Gardner, Carton & Douglas, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Integrated Measurement Systems, Inc. ("Integrated Measurement") sues International Commercial Bank of China ("International Bank") and Overseas Chinese Commercial Banking Corporation ("Overseas Bank") (International Bank and Overseas Bank are collectively referred to as "Banks") for having dishonored an irrevocable letter of credit ("LOC") issued by Overseas Bank to Pan Oceanic Products Corporation ("Pan Oceanic") and transferred to Integrated Measurement.[1] Integrated Measurement now moves for summary judgment against both Banks under Fed.R. Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Integrated Measurement's motion for summary judgment is granted against both Banks.

### Facts [2]

In December 1988 Integrated Measurement and Illinois-based Pan Oceanic entered into a purchase and sale agreement under which Integrated Measurement agreed to sell Pan Oceanic certain electronic measurement testing equipment for $68,860. Payment was to be made through an irrevocable and transferable letter of credit issued by Overseas Bank in Taiwan. On February 6, 1989 Overseas Bank issued its LOC in the amount of $74,020 to Pan Oceanic.

These were the relevant terms of the LOC (quoted from P. Mem. Ex. B, except that the prefatory numbers have been inserted by this Court):

1. form of documentary credit: IRREVOCABLE/TRANSFERABLE.
2. date and place of expiry: 890325 USA.
3. shpt/disptch at/transport to: FROM USA AIRPORT TO CKS AIRPORT (C AND F).[3]
4. partial shipment: ALLOWED.
5. transshipment: PROHIBITED.
6. shipment (of goods): 1 SET OF LOGIC MASTER HS 1000 MAINFRAME INTEGRATED CIRCUIT ANALYSER WITH ASSOCIATED ACCESSORIED (sic) AND OPTIONS. (DETAILS PER CONTRACT REF NO. PI-120288).
7. documents required:
   + SIGNED COMMERCIAL INVOICE IN 6 COPIES INDICATING THIS CREDIT NBR AND I/P NO. 77BH1-054487
   + CLEAN AIR WAYBILLS CONSIGNED TO OVERSEAS CHINESE COMM'L BKG CORP NOT LATER THAN 890317 MARKED FREIGHT PREPAID NOTIFY APPLICANT INDICATING THIS CREDIT NBR
   + PACKING LIST IN 5 COPIES
8. bank to bank information: SUBJECT TO UCP 1983 PUB NO. 400.

That final term expressly subjected the LOC to the terms of the Uniform Customs and Practice for Documentary Credits (1983 Revision), International Chamber of Commerce Publication No. 400 ("UCP").

International Bank in Chicago, Illinois acted as the advising and negotiating agent for Overseas Bank on the LOC. Pan Oceanic President Joseph Lin ("Lin") wrote a letter to International Bank (Amended

---

1. Because Integrated Measurement is an Oregon corporation with its principal place of business in that state, while both Banks are Taiwanese corporations, diversity-of-citizenship exists under 28 U.S.C. §§ 1332(a)(2) and 1332(c)(1).

2. Rule 56 imposes on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called upon to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case each of the Banks (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)). That is not a real problem in this case, because it is not the facts that are in dispute but the legal standards—thus making this case ripe for summary judgment.

3. "CKS airport" is apparently in Taiwan (P. Mem. 10), but in any case the fact that it was obviously an overseas destination is the only significant point for this opinion.

Complaint Ex. B) asking that the LOC be transferred to Integrated Measurement with the same terms and conditions as the original LOC, except that airway was to be from Portland, Oregon to Chicago O'Hare International Airport ("O'Hare") with the latest shipping date as March 10, 1989.

On February 15[4] International Bank transmitted its Advice of Transfer to Integrated Measurement in Oregon through its advising bank, First Interstate Bank of Oregon, N.A. ("First Interstate"). That Advice of Transfer (P. Mem. Ex. D) notified Integrated Measurement that the right to demand payment under the LOC had been transferred from Pan Oceanic as the original beneficiary to Integrated Measurement in the amount of $68,860. It restated the exact terms of the original LOC with some material exceptions:

1. It stated: "SHIPMENT FROM PORTLAND, OR, TO O'HARE INT'L AIRPORT CHICAGO NOT LATER THAN MARCH 10, 1989" and "PARTIAL SHIPMENT PROHIBITED, TRANSSHIPMENT ALLOWED."

2. It itemized in detail the goods to be shipped.

In reliance on the Advice of Transfer issued by International Bank (and not itself having seen the LOC), Integrated Measurement sent the goods described in the Advice of Transfer via United Airlines from Portland to O'Hare on March 2. On March 9 Integrated Measurement also delivered to First Interstate all of the documents required by the Advice of Transfer. International Bank received the documents from First Interstate on March 10.

At that point supervening events took over. United States Department of Commerce ("DOC") suspended Pan Oceanic's export license on March 3, informing Pan Oceanic that "[n]o shipments may be made against this license until further notice" (P.R.Mem.Ex. A). Pan Oceanic's license

was then revoked on May 18 (*id.* Ex. B). After the goods arrived at O'Hare (post-suspension though prior to revocation of the export license), they were seized by DOC.[5]

On March 30, five days *after* the expiration of the LOC, International Bank refused payment—notifying First Interstate by telex that the documents presented did not comply with the terms and conditions of the Advice of Transfer in three ways (Tai[6] Aff. ¶ 6):

(1) the description of the goods on the Airway bill was not consistent with that on the commercial invoice;

(2) the commercial invoice did not bear the statement "details per P/O No. PO/120288";

(3) the flight/date, rate and freight charge were written by hand on the Airway bill without appropriate correction stamps.

On March 31 Pan Oceanic's lawyer wrote a letter to International Bank (D.Mem.Ex. 2) telling it that Pan Oceanic's export license had been revoked (although, as already stated, it had only been suspended). Then on April 4 International Bank informed First Interstate by telex that payment on the LOC was being refused for the additional reason that the condition of obtaining a valid export license was not met.

Under its Amended Complaint, Integrated Measurement asserts (1) a breach of the LOC by Overseas Bank (Count I), (2) a breach of the Advice of Transfer by Overseas Bank (Count II) and (3) a breach of the Advice of Transfer by International Bank (Count III). Though the nature of the claims against the two Banks thus differs somewhat, the operative principles by which they must be judged are identical.

### Letter of Credit Principles and Their Application

At the outset it is useful to recapitulate some basic LOC law to serve as the

---

4. All dates from this point forward occurred in the year 1989 unless otherwise noted.

5. DOC later released the goods to Pan Oceanic. Banks claim that Pan Oceanic has offered to ship the goods back to Integrated Measurement

but that Integrated Measurement has not taken them back.

6. "Tai" is International Bank's Vice President Henry Tai, General Manager of its Chicago branch office.

backdrop in this classic case charging wrongful dishonor of an LOC. Three separate agreements are involved in the issuance of an LOC for the benefit of a beneficiary (*First Arlington National Bank v. Stathis*, 90 Ill.App.3d 802, 807, 46 Ill.Dec. 175, 180, 413 N.E.2d 1288, 1293 (1st Dist.1980), quoting *Baker v. National Boulevard Bank of Chicago*, 399 F.Supp. 1021, 1024 (N.D.Ill.1975)):

> The first is the contract between the beneficiary * * * and the customer * * * which is the agreement underlying the letter of credit. Under the second contract, the customer procures a letter of credit, often from a bank, in return for consideration or collateral. The third agreement consists of the bank's agreement to pay the beneficiary the amount of the letter of credit, if the beneficiary complies with the terms of the credit.

What is crucial to LOC transactions is that the third agreement must be understood as entirely *independent* from the other two. That is a basic principle that bears repetition here (especially in light of the fact that Banks insist upon ignoring it). Known as "the independence principle," it "prohibits the issuer of a letter of credit from looking at any material or facts other than those appearing in the draw documents themselves" (*Occidental Fire & Casualty Co. of North Carolina v. Continental Bank N.A.*, 918 F.2d 1312, 1315 (7th Cir.1990)). UCP Arts. 3 and 4 set out that principle in unambiguous language:

> 3. Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the credit.

> 4. In credit operations all parties concerned deal in documents, and not in goods, services and/or other performances to which the documents may relate.

No point of law in this case is clearer than the principle that Banks *must* deal only in documents and cannot look to the performance of the underlying contract between Pan Oceanic and Integrated Measurement for relief from their obligations under an LOC. Accordingly this opinion turns first to the credit instrument itself.

### Operative Credit Instrument

There is a great deal of confusion between the parties as to the impact of the Advice of Transfer on the terms of the original LOC. However, they have needlessly complicated what both sides acknowledge to be a standard procedure in LOC transactions.

Neither First Interstate nor Integrated Measurement saw or was shown the actual LOC in this case. Both Banks and Integrated Measurement agree that it is the usual and customary practice for a seller of goods who is to receive payment through an advice of transfer to *rely* on such advice. That being so, Banks are right in their insistence upon (and Integrated Measurement is wrong in its resistance to) the proposition that the critical operative credit instrument as between Banks and Integrated Measurement is the Advice of Transfer and *not* the original LOC.

In short, where as here the issuing bank (in this instance Overseas Bank) uses another bank (in this instance International Bank) to advise the transfer of the credit to the beneficiary, and then International Bank transfers the credit via a teletransmission that details the terms of the credit, that telex itself now becomes the operative credit instrument.[7] This opinion therefore turns to Banks' contentions that Integrated Measurement's performance did not conform to the terms of the credit—that is, the Advice of Transfer.

---

**7.** Another (and separate) potential issue here might have stemmed from the disparities between the LOC and the Advice of Transfer. According to UCP Art. 54(e) a "credit can be transferred only on the terms and conditions specified in the original credit, with the exception of the amount of credit" and other exceptions that do not apply here. That potential issue would relate to International Bank's liability for its mistake, a question that need not be reached in light of the development discussed immediately before the "Conclusion" of this opinion.

### Conformity of Documents

■ First, the fact that the Advice of Transfer was the operative credit instrument knocks the transshipment issue out of the ring in one blow: Banks cannot argue that the airway bill, by reflecting a transshipment between Portland and O'Hare, did not conform to the terms of the credit. International Bank's Advice of Transfer expressly allowed it.[8] That general proposition facilitates the resolution of the three specific claims of nonconformity with the terms of the Advice of Transfer that were set out in International Bank's March 30 telex to Integrated Measurement.

Once again a preliminary question needs to be looked at before those alleged discrepancies may be addressed: Just how much conformity is required between the terms of the credit and the documents to which it refers? That question has historically been more easily asked than answered by courts, as the parties here have demonstrated by their disagreement over whether compliance must be "strict" or "reasonable." Neither the Uniform Commercial Code ("UCC") nor the UCP supplies a test for judging document compliance, so that it has been left to the state courts (in this case the courts of Illinois[9]) to define (or refine) the operative standard (White & Summers, *Uniform Commercial Code* § 19–5, at 833 (3d ed. 1988)).

*First Arlington*, 90 Ill.App.3d at 814–15, 46 Ill.Dec. at 185, 413 N.E.2d at 1298 appeared to move away from the traditional doctrine of "strict compliance" to a more lenient standard of "reasonable compliance" because—as the Appellate Court said there—"insignificant variance between the letter of credit requirements and the documents submitted in compliance therewith is permissible" (see also this Court's opinion, following the lead of *First Arlington* in a diversity case, in *Crocker Commercial Services, Inc. v. Countryside Bank*, 538 F.Supp. 1360, 1362 (N.D.Ill.1981)). However, later Illinois Appellate Court cases leave some question in that respect: *Mount Prospect State Bank v. Marine Midland Bank*, 121 Ill.App.3d 295, 302, 76 Ill.Dec. 844, 849, 459 N.E.2d 979, 984 (1st Dist.1983) was equivocal as to which test should be applied, while *Auto–Owners Insurance Co. v. South Side Trust & Savings Bank*, 176 Ill.App.3d 303, 310, 126 Ill.Dec. 13, 18, 531 N.E.2d 146, 151 (3d Dist.1988) somewhat cryptically appeared to adhere to the notion that " 'strict compliance' is necessary in order to hold an issuer of a letter of credit accountable for failure to honor a draft" (*id.*, mysteriously citing *Mount Prospect* for that proposition—which it does not really support).

■ But it is important not to be misled by merely formalistic differences. *First Arlington*'s holding that an issuer will not be allowed to dishonor when the variance is insignificant is *not* inconsistent with a requirement that compliance be strict. Altogether too much has been made of a supposed dichotomy between the two terms "strict" and "reasonable," leading in turn to lawyers' and judges' (to say nothing of authors'[10]) attempts to force particular factual situations under one rubric or the other. Strict compliance is indeed the traditional—and it may even be the better—

---

8. As will be discussed later in this opinion, Banks are precluded from arguing nonconformity if proper notice of such nonconformity was not given to Integrated Measurement. Consequently, in the case of the airway bill reflecting transshipment, even if the LOC had been the operative credit instrument Banks never informed Integrated Measurement that such nonconformity was one of the reasons for dishonor, so they are precluded from raising it now.

9. Both sides agree that Illinois law applies (P.Mem. 5 and D.Mem. 6 n. 3).

10. In candor, this Court has little patience for the discussion that appears in such works as

Dolan, *The Law of Letters of Credit* (2d ed. 1991), which voices criticism of such decisions as *First Arlington* simply because they do not fit into the neat little compartments that the author has created in his own mind by a perception that "strict" and "reasonable" compliance are mutually exclusive concepts—or which voices criticism of such decisions as *Crocker Commercial* because the author does not seem to understand that the role of federal judges in diversity cases is simply to adhere to Illinois law (as exemplified, for example, in *First Arlington*) and not to fashion their own views of the "correct" law.

rule (see *Banque Paribas v. Hamilton Industries International, Inc.*, 767 F.2d 380, 384 (7th Cir.1985)). But the overall teaching of Illinois law is that the rule should not be followed slavishly without recognizing the inequity that would result if banks could simply dishonor letters of credit based on minor, trivial discrepancies that do not place in doubt the terms of the letter of credit (see White & Summers § 19–5, at 835–40). Therefore this Court adheres to Illinois law by following the general doctrine of strict compliance—understanding that doctrine, as interpreted and applied by Illinois courts, as perhaps encompassing an allowance for arguable discrepancies that are minuscule and not misleading (see a similar discussion by this Court's colleague Judge Ann Williams in *Brown v. First National Bank of Chicago*, 1989 WL 4348, 1989 U.S.Dist. LEXIS 470, at 4–7 (N.D.Ill.), adopting the standard expressed in *Flagship Cruises, Ltd. v. New England Merchants National Bank of Boston*, 569 F.2d 699, 705 (1st Cir.1978) that allows "a variance ... if there is no possibility that the documents could mislead the paying bank to its detriment").[11]

So much then for painting the larger backdrop against which the current scene must be viewed. It is time to turn to Banks' specific arguments.

■ Banks first contend that the description of the goods on the airway bill was inconsistent with the commercial invoice. On that score UCP Art. 41(c) clearly states the criteria for descriptions of goods:

> The description of the goods in the commercial invoice must correspond with the description in the credit. In all other documents, the goods may be described in general terms not inconsistent with the description of the goods in the credit.

In this instance the description of the goods in the invoice matched word for word the description of the goods in the

Advice of Transfer. In the airway bill the goods were described as "Electronic Verification Equipment, Details Per P/O No. PO–120288." That reference to the Purchase Order (D.Mem.Ex. 3) drawn up by Pan Oceanic and sent to Integrated Measurement mirrors the reference to the same document in the Advice of Credit ("DETAILS PER P/O NO. PO–120288"). There is no way in which that can be characterized as "inconsistent with the description of the goods in the credit."

Next is the even more meritless argument by Banks that the commercial invoice needed to include the phrase "details per P/O No. PO/120288." No legitimate reason exists why the commercial invoice must have done so. As will be discussed later in this opinion, Banks' reason for pressing that point is an attempt to break the cardinal rule of LOC law by bringing in the underlying agreement between Integrated Measurement and Pan Oceanic. Banks' Advice of Credit (echoing the LOC) merely required "signed commercial invoice in 6 copies indicating L/C No. 9MH1/00100/IBCCH and import permit no. 77BH1–054487," and those requirements were met.

■ Finally, Banks' third stated reason for dishonor—written notations on the airway bill without appropriate stamps—is equally empty. Banks have adduced no law or other requirement—and this Court knows of none—specifying that transport documents must be written or typed or printed in any particular ink or that such notations be accompanied by correction stamps.

■ Next in line for consideration is the additional reason for dishonor stated in International Bank's second telex: that Integrated Measurement failed to fulfill the condition of obtaining a valid export license. Here we reach the heart of Banks'

---

11. If there really were a split in Illinois jurisprudence as between *First Arlington* in the First Appellate District (a decision not really altered by *Mount Prospect*) and *Auto–Owners* in the Third, and if it made a difference here (as it does not), this Court would be obligated under still another principle of Illinois law to follow *First Arlington* (see this Court's opinions in *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1131–33 (N.D.Ill.1986) and *Abbott Laboratories v. Granite State Insurance Co.*, 573 F.Supp. 193, 196–200 (N.D.Ill.1983) and cases cited in those opinions).

ignorance (or perhaps their deliberate ignoring) of LOC law. To repeat the "independence principle"—this time in the language of *Pastor v. National Republic Bank of Chicago*, 76 Ill.2d 139, 147–48, 28 Ill.Dec. 535, 538, 390 N.E.2d 894, 897 (1979):

> The obligation of the credit is without reference to the compliance of the buyer (customer) or the seller (beneficiary) with the underlying contract. The issuer deals only with documents which must comply with the terms of the credit.

Thus it is that any modification or non-fraudulent breach of the underlying contract does not affect the rights and duties under the LOC (*First Arlington*, 90 Ill. App.3d at 808, 46 Ill.Dec. at 181, 413 N.E.2d at 1294). Accordingly this Court must not, and it will not, entertain any arguments by Banks that Integrated Measurement cannot claim payment on the LOC because procuring a valid export license was a precondition to the sale.[12]

Banks attempt to salvage the same argument by urging that the export license precondition, as stated in the Purchase Order, was somehow incorporated into the Advice of Transfer. In that respect the Purchase Order, a letter to Integrated Measurement from Pan Oceanic's President Lin, made the following reference to an export license (D.Mem.Ex. 3):

> I am pleased to place this subject order, subject to the grant of a valid Export License from U.S. Dept. of Commerce.

Banks contend that condition was expressly made a part of the credit via this line, which followed the description of goods in both the LOC and Advice of Transfer:

> Details per P/O No. PO–120288.

But that passing reference is a far cry from expressly incorporating the Purchase Order, much less the requirement of an export license assertedly built into the Purchase Order, into the credit agreement. As already mentioned, UCP Art. 3 clearly states that "banks are in no way concerned with or bound by such [underlying] contract(s), even if any reference whatsoever to such contract(s) is included in the credit."

Banks attempt to argue that the reference to the Purchase Order is ambiguous as to whether that document was being incorporated, thus posing a question of fact such as to preclude summary judgment. That argument is wholly unpersuasive. What the Advice of Transfer does is to say that the $68,860 credit is available to Integrated Measurement by sight draft "accompanied with the following documents," after which it lists *three* and only three documents (it also identifies by numbered listing the ten products to be shipped and referred to in the "packing list," the last of the three items). Only then does the Advice of Transfer advert to "DETAILS PER P/O NO. PO–120288," which it will be remembered did *not* accompany the Advice of Transfer. Plainly the Purchase Order reference is *only* a reference of the type disclaimed in UCP Art. 3, one that gives no reasonable indication that all its terms were being incorporated into the operative document.

Nor may Banks rely on *Banque Paribas* for the proposition that LOCs may incorporate conditions in addition to the submission of documents. Such an added condition was indeed present in *Paribas*, where Paribas had to submit a signed statement certifying that it had been called upon to make payment under its guaranty. But in *Paribas* the LOC was *explicit* about the guaranty condition (767 F.2d at 385), and the guaranty itself was attached as an exhibit to the LOC (*id.* at 382). Here there was no such explicit requirement of an export license, and the only document that even referred to such a license was not transmitted with the Advice of Transfer.

■ Moreover, any notion that it may have been an implied requirement cannot

---

12. It may be observed parenthetically, as Integrated Measurement points out, that it is far from clear just what the underlying agreement contemplated as to the timing of the requirement of a valid export license. At the time that Integrated Measurement shipped the goods, Pan Oceanic's export license was still valid. In any case, the nature of the requirement and whether or not that requirement was in fact fulfilled are not issues in this case.

be maintained.[13] As the principle was put succinctly in *Banque Worms v. Banque Commerciale Privee*, 679 F.Supp. 1173, 1180 (S.D.N.Y.1988) (citations omitted):

> Since a beneficiary must strictly comply with the requirements of a letter of credit, it must know precisely and unequivocally what those requirements are. Therefore, "[t]he corollary to the rule of strict compliance is that the requirements in letters of credit must be explicit."

It is truly for the protection of the banks—just as much as for the benefit of the contracting principals—that the credit instruments must make documentary requirements absolutely clear. It requires no great stretch of the imagination to visualize the anguished screams of the banking community if an LOC beneficiary were to attempt to import the terms of an extraneous document—one merely referred to in, but not accompanying, the LOC—in an effort to argue that it *had* complied with the LOC conditions although the LOC itself would call for a different result. Because the granting of a valid export license was not plainly stated as a condition in the Advice of Transfer, Banks' efforts to make it such a condition must be viewed as a desperate attempt to escape their unambiguous obligations.

So much, then, for the four reasons for dishonor stated by International Bank in its two telexes. In this litigation, though, Overseas Bank's Answer also came up with something altogether new, claiming that the airway bill was not "clean." As defined by UCP Art. 34:

> A clean transport document is one which bears no superimposed clause or notation which expressly declares a defective condition of the goods and/or the packaging.

Bearing no such notations, Integrated Measurement's airway bill was in fact "clean." More importantly, however, the next section of this opinion demonstrates that Banks cannot now pick and choose newly asserted reasons why the documents did not comply—they are limited to those listed in the original notifications of dishonor.

In conclusion, although this Court perceives that "strict compliance" appears to be the current order of the day under Illinois law, it is unnecessary to flesh out that concept or to explore its limitations here, because all of Banks' attempts to argue nonconformity are without merit. This opinion now turns to the reason why even if some arguable nonconformity had been shown, Banks are precluded from arguing it.

### Waiver and Estoppel

■ Integrated Measurement argues that Banks' notice of dishonor was deficient in several respects, so that Banks have waived, and are estopped from asserting, any arguments of nonconformity. Traditional elements of waiver and estoppel (such as detrimental reliance) need not be shown in this case because the UCP provides its own preclusion formula for this situation. According to UCP Art. 16:

> c. The issuing bank shall have a reasonable time in which to examine the documents and to determine as above whether to take up or to refuse the documents.
> d. If the issuing bank decides to refuse the documents, it must give notice to that effect without delay by telecommunication or, if that is not possible, by other expeditious means, to the bank from which it received the documents (the remitting bank), or to the beneficiary, if it received the documents directly from him. Such notice must state the discrepancies in respect of which the issuing bank refuses the documents....
>
> \*   \*   \*   \*   \*   \*
>
> If the issuing bank fails to act in accordance with the provisions of paragraphs (c) and (d) of this article ... the issuing bank shall be precluded from claiming that the documents are not in accordance

---

**13.** What the *Paribas* court found to be a question of fact barring summary judgment was the question whether "the parties intend[ed] the guarantee to be incorporated in the letter of credit, so that compliance with the guarantee was required for compliance with the letter of credit" (767 F.2d at 385). No such ambiguity is created here under the facts just stated in the text.

with the terms and conditions of the credit.

As for the requirement that the notice "must state the discrepancies," that tracks the doctrine enunciated in the case law that any grounds for dishonor not stated in the original notice are waived (*First Arlington*, 90 Ill.App.3d at 812, 46 Ill.Dec. at 183, 413 N.E.2d at 1296; *American Employers Insurance Co. v. Pioneer Bank & Trust Co.*, 538 F.Supp. 1354, 1357 (N.D.Ill.1981)). In the same vein, *Occidental Fire*, 918 F.2d at 1318 says:

> Although neither the Illinois UCC nor the UCP specifically states that a bank must give unambiguous reasons for dishonor of a sight draft, we think such a rule comports with the general good faith requirement.

Although neither side has supplied this Court with the notice of dishonor itself, International Bank Vice President Tai has identified the three grounds that International Bank cited in the first telex and the additional ground of the export license adverted to in the second telex (Tai Aff. ¶¶ 6, 8). Banks must be held to have waived all other arguments of nonconformity that were not mentioned in the two notices: in this instance the objections that the airway bill reflected transshipment and that the airway bill was not clean.[14]

█ There is an even stronger (and total) bar to Banks' arguments: Under UCP Art. 16 Banks are estopped from arguing nonconformity by reason of the failure to give Integrated Measurement timely notice of the defects. International Bank received Integrated Measurement's documents on March 10 and did not notify Integrated Measurement of its objections until March 30—fully 20 days later and, indeed, five days *after* the credit had expired, so that Integrated Measurement was precluded from curing the defects.

This Court has decided that issue squarely in an LOC beneficiary's favor in the past. Under similar circumstances it held in *Crocker*, 538 F.Supp. at 1363 that when a bank waited until after the expiration date of the LOC to dishonor, the "Bank's conduct may fairly be viewed as creating either a waiver or an estoppel, for it stood by silently and permitted the Letter of Credit to run out, even though an identification of the claimed deficiencies would have enabled Crocker to cure them."

Under UCP Art. 16 Banks cannot claim nonconformance as a reason for dishonor if International Bank had a "reasonable time" in which to examine the documents and then did not notify of the refusal of the documents "without delay by telecommunication or, if that is not possible, by other expeditious means." Given the unquestionable availability of a "reasonable time" for International Bank's examination, the other timing requirement of notice "without delay" was violated here as a matter of law.

As for the meaning of "reasonable time," according to the UCC a bank has three business days to review the documents (Ill. Rev.Stat. ch. 26, ¶ 5–112(1)(a)). Although it is possible that the UCP might allow more than three business days (*Occidental Fire*, 918 F.2d at 1318 n. 3; Dolan ¶ 4.06[2][b], at 4–28 and –29), in this case it is clear that the ten days that International Bank had before the expiration of the letter of credit was far more than enough time to examine the documents.

And as for notification "without delay," the obvious purpose of that rule is to allow the opportunity to cure the claimed defects (*American Employers*, 538 F.Supp. at 1357). As such, a bank's transmittal of notice after the expiration date has passed normally cannot be "without delay"—al-

---

**14.** That equitable (as well as UCP-dictated) approach to holding a party to its originally-stated legal position is a near relative to the principle that bars a litigant (most frequently, in the reported cases, an insurance company) from "mending its hold" (see *Harbor Insurance Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir.1990)). But in the LOC situation the bank's mandated adherence to its original statement of

discrepancies is even more important, for that statement is critical in defining the beneficiary's opportunity to cure any identified defects—the subject next discussed in the text (see also the opinion by Justice Powell, sitting by designation with the Eleventh Circuit, in *Kerr–McGee Chemical Corp. v. FDIC*, 872 F.2d 971, 973–74 (11th Cir.1989)).

though one obvious exception to that would be the situation where the beneficiary has waited until the last minute to draw on the LOC, in which event the issuing bank does not have "to drop everything" to examine the documents (see *Occidental Fire*, 918 F.2d at 1318 n. 3).

In *Datapoint Corp. v. M & I Bank of Hilldale*, 665 F.Supp. 722, 727 (W.D.Wis. 1987), one of the few reported cases applying UCP Art. 16, the issuing bank decided to dishonor on the same day that it received the drafts—one day before the expiration date—and it promptly mailed the notice of dishonor, which thus did not arrive until three days after expiration of the credit. *Datapoint* held that once the issuing bank knew that it was going to dishonor, UCP Art. 16 actually required *telephonic* notice to the beneficiary so that it would have time to cure (*id.*). In *Bank of Cochin v. Manufacturers Hanover Trust Co.*, 808 F.2d 209, 213 (2d Cir.1986) a 12 to 13 day delay in notifying the beneficiary of claimed noncompliance was held to violate the UCP "without delay" standard, the court stating that "the phrase is akin to 'immediate (*at once*), instant, instantaneous, instantly, prompt'" (*id.* (citation omitted, emphasis in original)) and therefore holding the bank estopped from asserting noncompliance with the LOC. To the same effect, *Kuntal, S.A. v. Bank of New York*, 703 F.Supp. 312, 314 (S.D.N.Y.1989) followed *Bank of Cochin* and decided that a nine-day delay in notifying the beneficiary of a decision to dishonor was too long, again estopping the issuer from asserting nonconformity.

If notice must be swift in the event of imminent expiration (*Datapoint*) and if in any event nine days (*Kuntal*) or 12–13 days (*Bank of Cochin*) is too long—concepts with which this Court agrees wholeheartedly—it is clear beyond doubt that International Bank did *not* timely inform Integrated Measurement in *this* case. As a result Banks are expressly precluded by UCP Art. 16 from asserting nonconformity as a reason for dishonoring Integrated Measurement's documentary draft.

In summary, then, if nonconformity is deemed the focal point of this case, this Court has found that Integrated Measurement's documents conformed in every respect to the Advice of Transfer. But even before any such examination for conformity is required—that is, in terms of a preliminary inquiry into waiver and estoppel as the focal point—Banks' tardy notice of dishonor precludes any substantive arguments of nonconformity. No matter how this Court slices the facts in this case, the result is the same: Banks' dishonor of the credit was wrongful and Integrated Measurement is entitled to damages. That then leads to the final question: From whom can Integrated Measurement recover?

### Liability for Inaccuracy in Advice of Transfer

■ From a purely contractual standpoint, an LOC beneficiary can recover damages only from the issuing bank—in this case Overseas Bank, the only party in privity with Integrated Measurement on the credit agreement. By performing the service of advising the LOC, International Bank served the function of an "advising bank"—acting as the agent of the issuer, in this case Overseas Bank. Because there is no privity of contract between an advising bank and the LOC beneficiary, International Bank did not owe Integrated Measurement any direct contractual duty and is under no contractual obligation to pay (*Sound of Market Street, Inc. v. Continental Bank International*, 819 F.2d 384, 388–89 (3d Cir.1987)).

■ However, International Bank does owe Integrated Measurement a *statutory* duty, one that does not emanate from the Advice of Credit or the UCP, whose Article 8 says this about the role of an advising bank:

A credit may be advised to a beneficiary through another bank (the advising bank) without engagement on the part of the advising bank, but that bank shall take reasonable care to check the apparent authenticity of the credit which it advises.

In other words, the advising bank will not be on the hook for payment on the LOC, but it does have a limited obligation to check the authenticity of the credit. Although *that* duty is not in issue in this case, Illinois statutory law (Ill.Rev.Stat. ch. 26, ¶ 5–107(1)[15]) sets out still another responsibility:

> Unless otherwise specified an advising bank by advising a credit issued by another bank does not assume any obligation to honor drafts drawn or demands for payment made under the credit but it does assume obligation for the accuracy of its own statement.

Here International Bank clearly misstated the terms of the LOC in the Advice of Transfer, so it becomes necessary to decide whether that UCC provision is applicable to this case.

When an LOC expressly incorporates the terms of the UCP (as was done here), those terms take precedence over the UCC's terms and are binding on the parties (White & Summers § 19–3, at 820; Dolan ¶ 4.06[1][a], at 4–23). That proposition, however, is subject to the qualification that UCP terms will not apply to a transaction to the extent that those terms would vary UCC provisions that do not themselves permit variance (*id.* ¶ 4.06[1][a], at 4–23 to –24). According to Section 1–102(3):

> The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

Section 5–107(1) sets out just such an obligation of "good faith, diligence, reasonableness and care" by requiring "accuracy" on the part of the advising bank. Thus the

question becomes whether the UCP Art. 8 requirement of "reasonable care to check the apparent authenticity of the credit" is simply an agreement as to "the standards by which the performance of the [Section 5–107(1)] obligation[] is to be measured." Clearly it is not—its requirement of "reasonable care" in checking (which would excuse an actual inaccuracy so long as it was not the result of negligence in checking out the facts) is a different (and lower) standard than the Section 5–107(1) duty to be objectively accurate.

Thus in Illinois there is no reason why both the UCP and the UCC obligations cannot apply to the advising bank.[16] Indeed, courts tend to refer to both sources even if the LOC explicitly provides that it will be subject to the UCP (see, e.g., *Instituto Nacional De Comercializacion Agricola (Indeca) v. Continental Illinois National Bank & Trust Co.*, 858 F.2d 1264, 1268–70 (7th Cir.1988), affirming this Court's opinion at 675 F.Supp. 1515 (N.D. Ill.1987)). Hence this Court finds that International Bank owed to Integrated Measurement a statutory duty to relay the terms of the credit accurately, and it is liable for any damages caused by its inaccuracy.

Initially Overseas Bank filed a Cross–Complaint against International Bank, claiming that the latter's deviation from the LOC in its preparation and transmittal of the Advice of Credit was the cause of any liability that might be imposed on the former in this action. On November 13, 1990 this Court granted Overseas Bank's motion for voluntary dismissal of that Cross–Complaint because Banks had struck this deal (Motion ¶ 3):

> OCCBC [Overseas Bank] and ICBC [International Bank] have now reached agreement on a settlement of the claims between them which provides, in pertinent part, that ICBC will indemnify,

---

**15.** That statutory paragraph number corresponds to the identical UCC section number. All further references to "Section—" will thus denote both the UCC section number and the paragraph number in chapter 26 of the Illinois statutes.

**16.** In that respect Illinois is unlike a state such as New York, which has adopted an amendment to the UCC that explicitly states that if parties stipulate in the LOC that it is subject to the UCP, Article 5 of the UCC does not apply (White & Summers § 19–3, at 821).

**950**

save, and hold OCCBC harmless in this litigation, including undertaking OCCBC's defense of the claims of Integrated Measurement Systems, Inc., plaintiff herein.

Whether Integrated Measurement is viewed as a third-party beneficiary of that settlement agreement or otherwise, one thing is clear: No useful purpose would be served by extending the analysis here to explore any possible difference in the scope of Banks' respective liabilities to Integrated Measurement. Now that International Bank's liability to Integrated Measurement has been established, that is the end of it. Indeed, the existence of the indemnification agreement means victory for Integrated Measurement in this action if this opinion's analysis is correct as to *either* (rather than both) Banks.

### Conclusion

There are no genuine issues of material fact, and Integrated Measurement is entitled to a judgment as a matter of law against both Banks. Accordingly judgment is ordered against each of them jointly and severally in the sum of $68,860 plus prejudgment interest at the annual rate of 5% pursuant to Ill.Rev.Stat. ch. 17, ¶ 6402. Integrated Measurement is directed to provide this Court in chambers on or before February 12, 1991 with a calculation of the judgment amount on the assumption of a February 25 judgment date. Absent Banks' submission to this Court's chambers of a different calculation (explaining its basis) on or before February 19, judgment will be entered in the amount calculated by Integrated Measurement.